IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHITUNDA TILLMAN, SR.,           )
                                  )
            Plaintiff,            )
                                  )
vs.                               )      Case No. 05 C 0910
                                  )
NEW LINE CINEMA CORP., et al.,    )
                                  )
            Defendants.           )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

*Pro se* plaintiff Chitunda Tillman, Sr. brought this copyright infringement action against New Line Cinema Corporation and Time Warner Inc. New Line and Time Warner have moved for summary judgment, and for the following reasons, the Court grants their motion.

## Facts

This case arises out of Mr. Tillman's claim that the New Line feature film *John Q*, which was released in 2002, infringes his copyright in a 1998 screenplay he wrote entitled *Kharisma (Heart of Gold) Based on Our True Story* ("*Kharisma Heart of Gold*"). Because New Line and Time Warner have moved for summary judgment, the Court views the facts in the light most favorable to Mr. Tillman and draws reasonable inferences in his favor. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987).

Mr. Tillman, proceeding *pro se*, filed his original two count copyright infringement suit on February 14, 2005 against eight defendants. After retaining counsel, he filed a sixty-three

1

page amended complaint on April 25, 2005, asserting nine claims against twenty-three defendants. Judge Nordberg, to whom this case was originally assigned, dismissed all claims against defendants other than New Line and Time Warner and dismissed with prejudice Counts 3 through 9 of the first amended complaint. Mr. Tillman sought leave to file a second amended complaint, but because his motions were denied, Counts 1 and 2 of the first amended complaint, to the extent that they assert claims against New Line and Time Warner, constitute the operative pleading. Tillman began proceeding *pro se* once again on May 3, 2007. The case was reassigned to this Court's docket on May 25, 2007.

In Counts 1 and 2, Mr. Tillman asserts copyright infringement claims against New Line and Time Warner. Mr. Tillman alleges that in January 1998, he wrote the screenplay *Kharisma Heart of Gold*, which derived from his experience with his sick child, who required serious heart surgery to avoid death at a time when Mr. Tillman did not have insurance to pay for it. Mr. Tillman registered his screenplay with the United States Copyright Office in July 1998, and in that same month he submitted a copy of it to the Writers Guild of America. Mr. Tillman alleges that the movie *John Q*, which was based on a screenplay by James Kearns, is substantially similar to *Kharisma Heart of Gold*. He alleges that Kearns worked for the WGA, had access to *Kharisma Heart of Gold*, stole it, and subsequently sold it–in the form of *John Q*–to New Line.

*Kharisma Heart of Gold* is the story of Tune Love, a very wealthy businessman who learns unexpectedly that his newborn daughter, Kharisma, has a rare heart condition, hypoplastic left heart syndrome. Kharisma requires a series of three operations in order to survive, but the hospital where Kharisma is born suggests that she is too young for the necessary surgery and recommends that Tune and his wife, Latrice, take their infant home to die. Undaunted, Tune

flies to Germany in his private jet to meet with the top surgeon in the field. When the German surgeon says that he is too old and forgetful to perform the procedures Kharisma needs, Tune flies back to Chicago to meet with another surgeon, later revealed to be the son of the German surgeon. Because the IRS has frozen over $50 million of Tune's assets and his health insurance has lapsed, however, Tune is unable to pay for the $600,000 surgeries. Without the money, the Chicago surgeon refuses to perform the surgeries.

Tune calls fifty people he has helped in the past and asks them to loan him money, but although he raises a substantial amount from various charities, it is not enough. After leaving the hospital, Tune stops by the shopping mall to eat at the food court. While he is enjoying his food, he witnesses two men robbing a clothing store at gunpoint after the proprietor accuses one of them of stealing some merchandise. Although the robbers succeed in shooting a sandwich out of Tune's hands, he manages to save the day, disarming the robbers and knocking them out.

As he drives away from the mall, Tune devises a plan to obtain the money for the operations: he will purchase a large life insurance policy and then kill himself. After going to church one last time with his family, saying goodbye to his son, Junior, and visiting the hospital, Tune drives off a cliff while "Trading My Life," a song by musician R. Kelly, plays in the background. Shortly thereafter, Latrice receives a life insurance check for $3.5 million, as well as a check from the German surgeon to cover the cost of the surgeries. As the movie closes, Latrice and the children once again enjoy a life of luxury. At night, Tune's spirit visits Kharisma, in perfect health five years after the surgeries, and Junior.

*John Q* tells the story of John Q. Archibald, a hard-working factory laborer struggling to make ends meet, his wife Denise, and his son Mikey. At the beginning of the movie, Denise's

3

car is repossessed, a result of the choice John had to make between car payments and rent payments after his hours at the factory were cut in half. Nevertheless, the family remains upbeat as they head to Mikey's baseball game after church the following Sunday. During the game, Mikey collapses as he rounds the bases. After rushing him to the emergency room, John and Denise learn that Mikey will die unless he receives a heart transplant, an operation that, because it is considered elective, John's insurance will not cover. John and Denise cannot afford the cost of the $250,000 procedure on their own, and the hospital refuses to place Mikey's name on the organ donor list without assured payment.

Rejected at every turn by social service agencies, John, or "John Q" as he later identifies himself to the police, decides to hold everyone in the emergency room hostage, including the surgeon who would perform Mikey's surgery. John hopes his actions will force the hospital to put Mikey's name on the transplant list. Although John receives a phone call from Denise letting him know that the hospital administrator has added their son to the list, John becomes convinced, after police snipers attempt to kill him, that the hospital will never help his son. After a tearful farewell to his son, who is slipping towards death, John attempts to shoot himself in the head so that doctors can transplant his own heart into his son's body, but the gun jams. As the streets outside the hospital fill with cheering supporters, the hospital learns that a young woman whose tissue is a perfect match for Mikey has died in a car accident that day. The doctors use her heart to save Mikey's life. Although John's actions ultimately save Mikey, they carry a cost. At the end of the movie, he is convicted of kidnaping all of the people present in the emergency room that day and as a result, he faces between three and five years in prison.

On April 20, 2007, New Line and Time Warner moved for summary judgment on the

remaining claims of Mr. Tillman's first amended complaint. Defendants argue that they did not commit copyright infringement because first, Mr. Tillman cannot establish that the *Kharisma Heart of Gold* screenplay was copied, and second, the *Kharisma Heart of Gold* screenplay is not substantially similar to *John Q*.

**Discussion**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party and draw reasonable inferences in its favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Summary judgment on a copyright infringement claim is proper when the defendant "has put forth clear evidence of independent creation and plaintiff has not come forward with any evidence of copying." *Gentieu v. Tony Stone Images/Chicago, Inc.*, 255 F. Supp. 2d 828, 860-61 (N.D. Ill. 2003).

New Line and Time Warner contend that Mr. Tillman cannot prove the necessary elements for copyright infringement. To establish copyright infringement, a plaintiff must demonstrate "1) ownership of a valid copyright, and 2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Defendants do not dispute that Mr. Tillman has a valid, registered copyright on his

5

screenplay for *Kharisma Heart of Gold*. They maintain, however, that New Line and Time Warner could not have copied Mr. Tillman's protected work because Kearns created *John Q* five years before Mr. Tillman wrote *Kharisma Heart of Gold* and that any similarities between the two works involve only noncopyrightable subject matter.

Copying may be proven either by direct evidence, which is often unavailable or difficult to obtain, or by inference, "'where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work.'" *Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 450 (7th Cir. 2001) (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)).[1] A plaintiff may establish proof of access by demonstrating that "the defendant had an opportunity to view the protected item." *Id.* at 508 n.5 (citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright, § 13.02[A] at 13-16 (1990)). Separate proof of access is not essential if "two works are so similar as to make it highly probable that the later one is a copy of the earlier one" because "if the later work was a copy its creator must have had access to the original." *JCW Investments, Inc. v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007) (quoting *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1170 (7th Cir. 1997)). A plaintiff's proof will fail, however, if the similarities between the two works are too minor to suggest copying. *See Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 508 (7th Cir. 1994).

Defendants contend the evidence they have submitted demonstrates that *John Q* was

---

[1] Mr. Tillman alleges that he has direct evidence, in the form of "expressions stolen, word for word, paraphrased, and inferred," that defendants copied *Kharisma Heart of Gold* to create *John Q*. Pl. Resp. at 12. However, such evidence is actually inferential proof, and the Court will analyze it accordingly.

created independently of and prior to the *Kharisma Heart of Gold* screenplay. The doctrine of independent creation can be used to rebut an inference of copying "if the alleged copier can show that she instead 'independently created' the allegedly infringing work." *JCW Investments*, 482 F.3d at 915 (quoting *Susan Wakeen Doll*, 272 F.3d at 450). "'A defendant independently created a work if it created its own work without copying anything or if it copied something other than the plaintiff's copyrighted work.'" *Id.* (citing 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 12.11[D], at 12-175 (2001)).

To support their contention, defendants have submitted an affidavit from Kearns, who states that he wrote the screenplay for *John Q* in 1993, registered it with the WGA the same year, and registered the first revision of it with the WGA in 1994–several years before Mr. Tillman wrote *Kharisma Heart of Gold*. Kearns Decl. ¶¶ 3-5 & Exs. A & B. Kearns further states that he sold the rights to *John Q* to Island World Productions, Inc. ("Island World") in 1993, and he attaches to his affidavit an executed copy of the October 25, 1993 Option Agreement pursuant to which he sold the rights. *Id.* ¶ 6 & Ex. C. Alfred Pariser, who in 1993 served as the Senior Vice President for Business and Legal Affairs of Island World, has submitted an affidavit corroborating Kearns' statements about the Option Agreement. *See* Declaration of Alfred Pariser ¶¶ 1, 2.

In connection with the sale of his rights to the *John Q* screenplay, Kearns also executed a Writer Agreement and an Inducement Letter dated October 25, 1993 and a Certificate of Authorship dated November 4, 1993. Kearns Decl., Exs. D & E. According to Kearns, he had neither heard of Mr. Tillman nor read any of his work prior to the commencement of this lawsuit. *Id.* ¶ 15.

7

Defendants have submitted articles from various entertainment industry periodicals as further corroboration for their contention that the creation of *John Q* predated that of *Kharisma Heart of Gold* by five years. Defendants contend that the articles, dating back to 1993, establish that Kearns wrote and sold an option for the *John Q* screenplay in 1993. First, *Daily Variety* reported on November 15, 1993 that Kearns had recently sold his *John Q* script "about a boy who needs a heart transplant" to production company Island World. *Id.*, Ex. F. The article goes on to describe the plot in greater depth, stating that it "concerns a little boy who collapses on the field during a Little League game and is rushed to a hospital, where it is determined that he needs a new heart." *Id.* According to the article, "when the hospital dismisses him from its donor waiting list because he doesn't have health insurance, the boy's distraught father takes the hospital's emergency room hostage." *Id.* Interestingly, the article also observes that this was the "second such story that [was] sold [that] month," as 20th Century Fox had also recently signed a deal with a writer to create a script "about a father who resorts to fraud and murder to obtain a heart for his dying son." *Id.*

The following year, in its October 4, 1994 issue, *The Hollywood Reporter* listed *John Q* as a film under development. *Id.*, Ex. G. Six years later, an article from the March 10, 2000 issue of *Daily Variety* (re-run in the March 13-19, 2000 issue of *Variety*) headlined "Cassavettes at Heart of 'Q'," stated that "Kearns originally sold the story in 1993 to production company Island World, which subsequently sold the property to Columbia." *Id.*, Exs. H & I. Pariser states that Columbia acquired from Island World the right to exercise the option to produce the screenplay, and a letter addressed to him from a Columbia representative on September 15, 1994 offers further proof. Pariser Decl. ¶ 5 & Ex. D.

8

Mr. Tillman attempts to refute defendants' evidence of independent prior creation by arguing that their testimony is fabricated and that none of the documentary evidence is credible.[2] Mr. Tillman's attacks on the credibility of defendants' evidence are largely conclusory; he states that "Kearns is a liar," that "Pariser is lying," and that the Option Agreement is "[f]ake." Pl. Resp. at 10, 13. Mr. Tillman also appears to allege a conspiracy among the defendants, *Daily Variety,* and LexisNexis. He argues that because the website for *Daily Variety* was not launched until August 2000, the 1993 *Daily Variety* article must be "conjured." Pl. Resp. at 13. He contends that Reed Elsevier owned both *Daily Variety* and Lexis Nexis and that "the film industry launders films" by stealing them and uploading false, backdated *Daily Variety* articles onto Lexis Nexis to establish prior creation. Pl. Opp. to Ferber Decl. ¶ 5.

According to Mr. Tillman, another conspiracy surrounds the 1994 *Hollywood Reporter* article mentioning *John Q*. He contends that the article defendants produced cannot be authentic because the periodical "destroyed all records from 1994-2001," *id.*, and in support he submits a photograph of the *Hollywood Reporter* offices "[p]roving [that he] conducted an investigation into the matter." Tillman Decl., Ex. F. Mr. Tillman's second, seemingly contradictory theory as

---

[2] In response to a letter from Mr. Tillman's then-counsel, Jeffery Dillard, defendants provided Mr. Tillman with copies of all of these entertainment periodical articles shortly before the filing of this suit; upon receiving them, Dillard notified defendants that Mr. Tillman was withdrawing his claim. Ferber Decl., Ex. E. Mr. Tillman now asserts that Dillard withdrew Mr. Tillman's claim to curry favor with defendants because he was trying to get them to produce a movie he wrote entitled Lana's Rain. Pl. LR Rule 56.1 Stat. at 4.
Following Dillard's withdrawal as his attorney, Mr. Tillman determined to pursue his action *pro se*, and, with the assistance of his next attorney, included two employees of *Variety* in his amended complaint, alleging that they had conspired with other defendants to fabricate the *Variety* articles. Although these defendants were subsequently dismissed with prejudice from the suit, Mr. Tillman continues to assert that the *Variety* articles are were fraudulently created, and that "there absolutely was a cover up and a conspiracy." Pl. Resp. at 13.

9

to how the 1994 *Hollywood Reporter* article could refer by name to *John Q* years before Mr. Tillman wrote *Kharisma Heart of Gold* concerns the possibility of fabrication. Mr. Tillman alleges that because the physical pages of the periodical are "cut and paste able" a would-be copyright infringer "can insert an article in there" to make it appear as though a work had been created by a certain date. Pl. Opp. to Ferber Decl. ¶ 5.

Mr. Tillman's suspicion of defendants' evidence extends to Kearns' 1993 and 1994 WGA registration certificates. He contends that Kearns could not have registered his screenplay with the WGA in 1993 because, according to Mr. Tillman, the WGA was neither conducting business nor physically present at 8955 Beverly Boulevard, the address shown on the registration certificates. Pl. Resp. at 13. To support his assertion that the certificates are "frauds, fakes, or phony," Mr. Tillman has submitted to the Court various photos, blueprints, phone records, and business cards that he contends prove that the WGA was not operating at 8955 Beverly Boulevard. Pl. LR 56.1 Stat. at 5; Pl. Exs. Z 15, Z 16. Defendants note, however, that Exhibit Z 15 undermines Mr. Tillman's argument, as it is a resolution issued by the city of West Hollywood on April 2, 1992, granting the WGA's request for a permit to expand its offices at the very address that Mr. Tillman contends did not house those offices.

Finally, Mr. Tillman argues that the absence of a copyright registration with the United States Copyright Office predating *Kharisma Heart of Gold* is evidence that *John Q* did not exist before 2000. The date on which a party registers its copyright is not terribly important for this purpose, however, because a copyright comes into existence at the time of a work's creation in a fixed form. 17 U.S.C. § 302(a). The Court finds similarly unpersuasive Mr. Tillman's argument that the fact that New Line registered a copyright in *John Q* in 2000 constitutes an admission that

10

*John Q* was not created prior to *Kharisma Heart of Gold*. Defendants have explained through an affidavit from Angela Clare, the Copyright Office employee who registered the *John Q* screenplay, that Clare put "2000" for the creation date of *John Q* merely because the revised script was dated in 2000 and she did not know the original creation date. Clare Decl. at ¶ 3-4. Mr. Tillman has not offered evidence genuinely disputing Clare's affidavit.

In sum, Mr. Tillman has failed to present any evidence, beyond unsupported conspiracy theories and conclusory accusations of lying, to controvert defendants' sworn testimony and documentary evidence establishing the creation of the *John Q* screenplay before *Kharisma Heart of Gold* existed. The "mere existence of an alleged factual dispute between the parties is not sufficient to defeat a motion for summary judgment." *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 973 (7th Cir. 2000) (citing *Anderson*, 477 U.S. at 252). "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Mr. Tillman's charges of lying and fabrication fail to rise to the level of definite, competent evidence. The Court concludes that there is no genuine issue of material fact as to whether defendants independently created *John Q* years prior to the creation of *Kharisma Heart of Gold*.

Though this conclusion is sufficient to require entry of summary judgment for defendants, the Court, out of an abundance of caution, will address the issues of access and substantial similarity. Mr. Tillman alleges that Kearns must have had access to the *Kharisma Heart of Gold* script after Mr. Tillman filed it with the WGA because Kearns is affiliated with that organization. It appears that Mr. Tillman reaches this conclusion based primarily on statements Kearns makes on the "Commentary" portion of the *John Q* DVD and on what Mr.

11

Tillman characterizes as inconsistencies in defendants' evidence as to the date of *John Q*'s creation.[3] For example, Mr. Tillman contends that Kearns' statement on the DVD that he was relieved to receive excellent healthcare coverage through the WGA demonstrated that Kearns actually worked for the WGA. *See* Pl. Opp. Resp. to Def. Reply at 14. To bolster his assertion that Kearns had access to the *Kharisma Heart of Gold* script through his affiliation with the WGA, Mr. Tillman refers to a *Variety* article stating that Kearns re-acquired the *John Q* screenplay from Columbia with the assistance of WGA. According to Mr. Tillman, the fact that Kearns re-acquired the *John Q* screenplay from Island proves that Kearns also had access to the *Kharisma Heart of Gold* script, which was in the possession of the WGA.

Setting aside the fact that Kearns could not possibly have accessed *Kharisma Heart of Gold* prior to writing *John Q* if *Kharisma Heart of Gold* had not yet been written, Mr. Tillman has not provided any competent evidence to suggest that Kearns had access to the *Kharisma Heart of Gold* screenplay. In response to defendants' requests to admit, Mr. Tillman admitted that he could identify no witness "that can confirm that they saw Kearns read Plaintiff's screenplay." Pl. Resp. to Def.'s First Set of Requests to Admit, Resp. No. 5. The WGA's regulations impose severe restrictions on access to works registered with it; even writers themselves cannot have their works returned to them. *See* Ferber Decl., Ex. K ("Because the deposited material cannot be returned to the writer without defeating the purpose of registration, registered material may not be withdrawn."). Thus, as defendants note, it would be difficult for Kearns to gain access to a copy of *John Q*, let alone *Kharisma Heart of Gold*. Without more,

---

[3] Mr. Tillman also argues that defendants "have not proved that Kearns didn't see" the script of *Kharisma Heart of Gold*. Pl. 1/24/08 filing at 14.

there is insufficient evidence for a reasonable jury to find that Kearns had access to his screenplay.

To support an inference of copying even if access could be inferred, Mr. Tillman would have to show that the protectable elements of *John Q* and *Kharisma Heart of Gold* were substantially similar. *See JCW Investments, Inc.*, 482 F.3d at 916. Substantial similarity is determined through the objective "'ordinary observer'" test by asking "'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Wildlife Express*, 18 F.3d at 509 (quoting *Atari*, 672 F.2d at 614). The Court looks at the works themselves to determine substantial similarity. Having watched the film *John Q* and read the screenplay *Kharisma Heart of Gold*, the Court concludes from a comparison of the two works that no reasonable observer could find them substantially similar beyond a very general level.

Defendants contend that most of the similarities Mr. Tillman alleges concern unprotectable ideas or similarly unprotectable *scènes à faire*. An idea is not protectable by copyright; only the original expression of the idea is. *See Feist Publ'ns*, 499 U.S. at 348-49; *JCW Investments*, 482 F.3d at 917; *see generally* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). "While the demarcation between idea and expression may not be susceptible to overly helpful generalization, it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and

characterization. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976). Under the *scènes à faire* doctrine, "incidents, characters, or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic" are not protectable by copyright. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005) (quoting *Atari, Inc.*, 672 F.2d at 616).

Defendants assert that certain *scènes à faire* necessarily follow from the treatment of the unprotectable general theme, contained in both *John Q* and *Kharisma Heart of Gold*, of a "distressed parent who will do anything to help his child who is hospitalized with a life-threatening condition." Def. Reply at 3. Defendants contend that Mr. Tillman cannot claim copyright infringement based on the presence in *John Q* of elements such as parents sitting in a hospital waiting room, nurses asking parents to fill out paperwork, parents praying over their sick child's bedside, parents singing and reading to their child, parents watching with sadness as their child is hooked up to monitors, or one parent pleading to the other to do something or fix the situation. Similarly, defendants argue that there is nothing actionable about common depictions of parents who go to church to pray for their child. The Court agrees; over the years, these common themes and ideas have appeared in movies again and again. They are too general to be seen as displaying the stamp of the author's originality and thus to qualify for copyright protection.[4]

Defendants note that several other elements that Mr. Tillman characterizes as similar

---

[4] Mr. Tillman argues that the elements in his script that defendants characterize as *scènes à faire* are protectable because unlike Kearns, who "didn't live this experience", Mr. Tillman based the situations in his script on his own experiences. Pl. Resp. at 19. Mr. Tillman states that he "is the source code and lived these expressions" and that because he "wrote them down in a copyright first" they are protected. *Id.* Whether the elements at issue were based upon events in Mr. Tillman's life does not bear upon whether they are protectable or, conversely, unprotectable *scènes à faire.*

14

arise out his overly-general characterization of elements of *Kharisma Heart of Gold*. For instance, Mr. Tillman contends that "a hostage drama unfold[s] in both scripts." Pl. Resp. at 20. However, although *John Q* is essentially a hostage drama, in which the protagonist's stand-off in a hospital emergency room is the main focus of the plot, there is no real hostage drama in *Kharisma Heart of Gold*. Instead, Tune Love, the main character, witnesses two men holding up a merchant at a mall while Love is eating in the food court. As defendants note, the men wielding the guns make no demands in exchange for the release of the merchant–in contrast to the hostage situation in *John Q*. Another purported similarity between the two works, "a violent car crash in which the heart became available," is again premised upon an overly-generalized characterization of the *Kharisma Heart of Gold* screenplay. *See* Pl. Resp. at 7. Whereas in *John Q*, a head-on car crash between a young woman in a sedan and a semi-truck produces the heart that is transplanted into the little boy, Tune Love's suicidal car crash in *Kharisma Heart of Gold* does not result in the availability of a heart. There is, in fact, no heart transplant at all in *Kharisma Heart of Gold*. Rather, the suicide results in life insurance funds becoming available to pay for the surgeries for Tune Love's daughter, an element not at all present in *John Q*.

After eliminating the unprotectable general ideas and *scènes à faire*, the Court must decide whether there is evidence that would permit a reasonable jury to find that *John Q* and *Kharisma Heart of Gold* are substantially similar. In his description of that test decades ago, Judge Learned Hand stated that two works are substantially similar if "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960), *quoted in Wildlife Express*, 18 F.3d at 509.

Setting aside the unprotectable theme of a sick child with a desperate parent unable to

pay for needed care and the similarly unprotectable *scènes à faire*, the Court concludes that no reasonable jury could find the two works to be substantially similar. Though much of *Kharisma Heart of Gold* takes place in the same general setting–a hospital–as *John Q*, the use of a hospital as a setting is not protectable. More significantly, the plots and moods of the two works are completely dissimilar; most of the action of *John Q* centers around a fraught hostage drama, while *Kharisma Heart of Gold* contains no hostage-taking at all. Although a car crash in *Kharisma Heart of Gold* allows Tune Love to kill himself, producing money to pay for Kharisma's surgeries, the car crash in *John Q* has a different purpose altogether, as it kills the woman who ultimately donates her heart to Mikey. Whereas the infant Kharisma requires surgeries on her heart, Mikey needs an entirely new heart.

The characters in each movie likewise bear no resemblance to each other; the fathers, who feature most prominently in each work, have strikingly different backgrounds and personalities. Tune Love lives a life of luxury until his assets are frozen, constantly boasts about the expensive clothes he designs and wears, and peppers his speech with crude jokes and sexual innuendo. On the other hand, John Q. Archibald is a modest man who operates heavy machinery for a living and savors simple pleasures like watching his son's baseball game and thumb-wrestling with his wife. And though the viewing audience becomes well-acquainted with Mikey (a seven- or eight-year-old boy) before his collapse and even as he lies in his hospital bed, Kharisma is a newborn girl too young to exhibit her personality.

In sum, the aesthetic appeal of each work is so fundamentally different that no ordinary observer and no reasonable jury could find them substantially similar.

**Conclusion**

For the reasons stated above, the Court grants defendants' motion for summary judgment [docket no. 144]. The Clerk is directed to enter judgment in favor of defendants. Plaintiff's motion to file excess pages [docket no. 202] was previously granted and is therefore terminated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 7, 2008